IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 29, 2004 Session

**STATE OF TENNESSEE, DEPARTMENT
OF CHILDREN'S SERVICES v. C.D.W.**

**Appeal from the Juvenile Court for Hamblen County
Nos. 10570, 12847, 13084     Mindy Norton Seals, Judge**

**No. E2004-00623-COA-R3-PT - FILED JANUARY 11, 2005**

This appeal involves the Juvenile Court's termination of the parental rights of C.D.W. ("Mother") to her three oldest children. After a trial, the Juvenile Court held there was clear and convincing evidence that Mother had failed to substantially comply with the terms of her permanency plans, and that the conditions present at the time the children were removed had not been remedied and it was unlikely these conditions would be remedied in the near future. The Juvenile Court also held there was clear and convincing evidence that termination of Mother's parental rights was in the children's best interest. We affirm the judgment of the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
Juvenile Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

J. Eric Harrison, Morristown, Tennessee, for the Appellant C.D.W.

Paul G. Summers, Attorney General and Reporter, and Mary S. Foust, Assistant Attorney General, Nashville, Tennessee, for the Appellee State of Tennessee, Department of Children's Services.

# OPINION

## Background

This is an appeal from the Juvenile Court's termination of Mother's parental rights to three of her children, who are currently ages eight, six, and two. This litigation began in 1997 when the oldest child was less than one year old. At that time, DCS filed a petition for temporary custody claiming Mother was refusing to cooperate in obtaining necessary medical treatment of the child after the child fell out of bed and was hospitalized due to a concussion. DCS also alleged Mother was refusing other assistance which was necessary to enable her to care properly for the child. The Juvenile Court granted the petition and the child was placed temporarily in DCS custody. Soon thereafter, a hearing was conducted after which the Juvenile Court concluded that Mother lacked basic parenting skills but the child would be returned to Mother with certain safeguards established. Mother was instructed to begin parenting classes within seven days and to undergo a psychological evaluation within thirty days and to follow all recommendations made by the psychologist. Approximately one month later, DCS filed a second petition for temporary custody claiming Mother had failed to enroll in parenting classes or otherwise comply with the previous court order and there was an imminent threat of harm based on the current living conditions. The Juvenile Court granted the petition and once again placed temporary custody of the child with DCS.

A permanency plan was developed in September of 1997 with the stated goal of returning custody of the child to Mother. In the plan, Mother was instructed to ensure the child received regular medical care and to follow-up with any recommended medical treatment. Mother also was directed to complete parenting and anger management classes, undergo an alcohol and drug assessment, and to have a psychological examination. Mother signed the plan which later was approved by the Juvenile Court.

A hearing was held in May of 1998 to review Mother's progress and the continuing need for her child to be in foster care. After the hearing, the Juvenile Court concluded that the child was to remain in foster care because: (1) Mother had not obtained a psychological evaluation; (2) Mother had obtained housing only one week before the hearing; and (3) Mother needed to pursue further anger management counseling. There were several other hearings in 1998 and after each hearing the Juvenile Court concluded the best interests of the child dictated that the child remain in foster care. Mother also was instructed on various occasions what needed to be done to allow the child to be returned safely to her care.

The child's maternal grandfather eventually petitioned the Juvenile Court for custody of the child. In April of 1999, the Juvenile Court entered an order relieving DCS of custody and placing custody of the child jointly with Mother and the child's grandfather. Mother also was instructed to continue with counseling. By this time, Mother's second child had been born.

The case apparently became inactive once custody of the oldest child was placed jointly with Mother and the child's grandfather, at least until October of 2001 when DCS filed a

petition seeking temporary custody of both of Mother's children. In this petition, DCS claimed the children were dependent and neglected for numerous reasons, including Mother leaving the children unsupervised while she slept and the youngest child setting the microwave oven on fire while attempting to cook something to eat when Mother was asleep. DCS also claimed that a case worker had made a recent home visit and found Mother asleep and the unsupervised children playing with Mother's prescription medication. DCS also claimed to have received numerous referrals "regarding the minor children playing outside naked without supervision while the mother is asleep." The Juvenile Court granted the petition and, upon Mother's request, appointed counsel to represent Mother.

New permanency plans were developed to assist Mother so that the children could be returned safely to her care. Mother was instructed to undergo counseling and attend parenting classes. Mother also was required to have a psychological evaluation, address her anger management issues, and follow up on any recommendations made by the psychologist. A permanency plan was developed with regard to each of the two children and the plans were approved by the Juvenile Court.

In January of 2002, the Juvenile Court reviewed the status of Mother's compliance with the permanency plans and whether there was a continued need for the children to be in foster care. The Juvenile Court concluded that Mother was only in partial compliance with the terms of the plans. Mother was attending therapy sessions and was improving her parenting skills. Notwithstanding these positive improvements, the Juvenile Court noted that Mother had recently been evicted from her residence and the birth of Mother's third child was imminent. Mother also had not completed anger management counseling. Accordingly, the Juvenile Court concluded that the children should remain in foster care.

Mother gave birth to her third child in February of 2002. By July, DCS had filed a petition seeking temporary custody of the five month old child. According to the petition, the police were called to the residence of a Mr. Bryant ("Bryant") in the early morning hours of July 14, 2002. The call to the police involved a domestic disturbance between Mother and Bryant, who was the father of Mother's third child. Mother was administered a field sobriety test, which she failed. Before the police arrived, Mother allegedly was demanding that Bryant have sex with her. The youngest child was with Mother when the police arrived at the scene. The Juvenile Court granted DCS's petition, thereby resulting in all three of Mother's children being in DCS protective custody.

Another permanency plan was developed for Mother after DCS obtained custody of her youngest child. This new plan contained many of the requirements of the previous plans, but also required Mother to undergo an alcohol and drug assessment and participate in any suggested treatment. Mother was required to refrain from using alcohol or drugs in the presence of the children. In February of 2003, new permanency plans also were developed for Mother with respect to her other two children who remained in DCS custody. Among other things, Mother was instructed to participate in an after-care program and to refrain from using alcohol or drugs in the presence of

the children.  Mother was required to obtain safe and adequate housing for the children and to pay the rent on time.

In April of 2003, DCS filed a petition seeking to terminate Mother's parental rights to all three of her children.[1]  In this petition, DCS alleged, among other things, that:  1) the children had been removed from the home for at least six months and the conditions which led to their removal persisted; 2) there was little likelihood that these conditions would be remedied at an early date which would permit a safe return of the children to Mother; 3) Mother was unable to provide a suitable home for the children; and 4) continuation of the parent/child relationship would greatly diminish the children's chances of early integration into a safe, stable and permanent home.  DCS also alleged there had not been substantial compliance by Mother with the terms of the permanency plans.  Finally, DCS alleged it would be in the best interests of the children for Mother's parental rights to be terminated.

The trial was on January 20, 2004, with Mother being called as the first witness. Mother testified that in addition to the three children who are the subject of the present litigation, she had one other child who then was approximately six months old.  Mother also testified she was one month pregnant with her fifth child.[2]  Mother was living with a Mr. Alonso ("Alonso").  Mother testified that she believed Alonso was the father of her unborn child, but she admitted recently informing DCS that the father also could be a Mr. Acosta ("Acosta").  According to Mother, she stopped seeing Acosta because he was physically abusive to her.  Mother admitted to having recently posed as the wife of a friend of Acosta's in order to help that friend make bail.  Mother stated she did this because "he was a friend and if I was in there he would do the same thing for me," i.e., lie for her.  When asked the friend's last name, Mother stated she did not know and she "don't never pay attention to last names unless I'm with them."

Mother testified that her rent money has been stolen from her on three different occasions.  Mother receives a monthly disability check from the Social Security Administration in the amount of approximately $540.  Mother currently lives in an apartment and has been there for six months.  Mother stated she had "no clue" where she lived before that because she moved too much.  Mother acknowledged living in a hotel on two occasions and at the Serenity Shelter for several months.  Mother had been taking medication for depression as well as sleeping pills but quit taking that medication once she became pregnant with her fifth child.  Mother also had been taking hydrocodone for back pain and admitted selling some of the hydrocodone to a neighbor to get the neighbor "out of my hair."  Mother further admitted telling DCS in November of 2003 that she could not pass a drug test because a friend had given her a hydrocodone pill.

_____

[1] With regard to the three children at issue in this case, Mother did not know the identity of the oldest child's biological father.  The other two children had different fathers and DCS indicated it would pursue termination of their parental rights in separate petitions, which are not at issue on this appeal.

[2] By the time of trial, DCS had obtained temporary custody of Mother's fourth child.

-4-

Mother testified that when the father of her fourth child, Mr. Rivera ("Rivera"), told her that he did not want to have anything to do with the child, Mother "smacked" him. However, Mother never intended on having a relationship with Rivera such that they would raise their child together. The reason for this was because Rivera had two other children. Mother made a conscious decision to get pregnant with her fourth child because she "wanted another baby."

Mother was questioned about the incident referenced above which occurred immediately prior to her third child being removed from her custody. Mother admitted having an argument with Bryant and that she had been drinking alcohol. Mother denied having her third child with her while she was drinking. Mother also admitted to a previous incident where she knocked out one of the headlights on Bryant's car because "he cheated on me and gave me something, and I had to take medication to get rid of it."

When asked why her three oldest children had been removed from her custody, Mother stated that "[t]echnically, I don't really know why any of them was removed to be honest with you. I really have no clue. All they say is neglect, but they don't explain what kind of neglect." Mother then admitted she should have been with her second child and not in the shower when he caught the microwave on fire.

Mother admitted that on September 24, 2002, she was convicted of assaulting Karen Brown. Mother claimed, however, that she was acting in self-defense and the only reason she was convicted was because Ms. Brown "beat me to the courthouse."[3] Mother does not have a valid driver's license and received a citation in August of 2003 for driving without a license. Mother also described an incident where her stepmother had canceled one of Mother's visits with the oldest child. Mother became angry because she and her father had told the stepmother not to cancel the visitation. According to Mother, "I tried to hit her, yeah, I did, because she made me angry. She's gotten – she has a habit of running that little mouth of hers."

Mother currently lives in a two bedroom apartment. There are two beds in one of the bedrooms where the two oldest children would stay if custody was returned to Mother. There are beds for Mother and the two youngest children in the other bedroom. Mother testified that the DCS case worker told her the apartment was acceptable. Mother receives a social security disability check every month, but does not know why she receives the check. She does, however, have back problems which makes it difficult for her to work but which would not prevent her taking care of the children. Mother stated she was attending therapy regularly and was not drinking alcohol. Mother has an aunt and a neighbor she can rely upon for transportation until she is able to obtain her driver's license. Mother stated she had missed only one scheduled visit with her children and that was because the transportation she had arranged "never showed up." Mother did not complete the

_____

[3] According to Ms. Brown's affidavit filed in the assault litigation, Mother was mad and beat a remote against the wall and then broke a bathroom mirror. Ms. Brown claims Mother then cut her with a razor. Mother was charged with aggravated assault, but pled *nolo contendere* to the lesser charge of assault. Mother received a sentence of eleven months and twenty-nine days and was released on time served.

aftercare requirements because of pregnancy complications with her fourth child. Mother claimed she did all the things required of her by the permanency plans that were within her power to accomplish.

The next witness was Heather Brush ("Brush"), a clinician at Cherokee Health Systems. Brush began counseling Mother in August of 2003, although Mother had been receiving counseling at Cherokee Health Systems since 2001. Mother cancelled her first appointment with Brush due to the birth of Mother's fourth child. Mother missed the next appointment but did show up for the third appointment. Mother did not keep the appointment scheduled in September of 2003, but she attended the appointment in November. At the November appointment, Mother told Brush that she had not been attending counseling regularly because she was "stressed." Mother also missed three scheduled appointments in December and January. According to Brush, Mother's attendance at counseling with the previous counselor was sporadic with Mother having attended counseling "about every three months." Some of the therapists' notes from Cherokee Health Systems were admitted into evidence. According to these notes, Mother told the therapist on April 29, 2002, that she had been "snitched on" for drinking alcohol and "smoking a little pot."

Brush testified that Mother was diagnosed as having a "mood disorder, not otherwise specified, alcohol abuse, sustain full remission and borderline personality disorder." The primary focus in the counseling sessions between Brush and Mother were Mother's parenting issues. Mother attended a total of six counseling sessions during 2003, but it was possible that Mother was not able to attend sessions during May and June of that year because she was in the process of being assigned a new therapist. Because Brush had counseled Mother on only three occasions, she was not able to give an opinion on Mother's ability to take care of her children. Brush stated that Mother's housing situation had stabilized as had her monetary situation.

Debbie Wideman ("Wideman") also testified at trial. Wideman met Mother a few years ago and allowed Mother to live with her on two different occasions. Wideman testified that when Mother was living with her and while Mother was pregnant with her fourth child, Mother drank alcohol to the point of intoxication. According to Wideman, on one occasion Mother fell down the stairs and on another she fell in the bathtub while intoxicated. Wideman stated that she and Mother had a "falling out" when Wideman learned Mother had given Wideman's fifteen year old son some muscle relaxers.

Amanda Willox-Giles ("Giles") works for Child and Family Tennessee which, among other things, offers various services to adults who need assistance with their parenting skills. Giles began working with Mother in October of 2002 and continued assisting her until late February of 2003. Giles testified that she "worked with her on transportation. I assisted her with getting appointments such as her psychological evaluation" and with completing parenting classes. While Giles was working with Mother, Mother lost her housing. Giles encouraged Mother to obtain new housing but Mother waited until three days before she had to vacate the premises before starting to look for a new place to live. According to Giles, Mother did not make much of an effort. Giles attempted to get Mother to sign up for a program that would assist Mother with paying her bills, but

Mother refused because she knew how to handle a checking account. When asked if Mother implemented what she was taught in parenting classes, Giles stated it was sporadic and Mother was not able to keep the children under control on a consistent basis. Giles acknowledged that there was a bond between Mother and her children. When asked about Mother's overall progress, Giles stated:

> I think [Mother's] progress is very slow. It always seemed to me that she would make a little bit of progress and then something would happen, and it would set her back again.… [I]t didn't seem like she was consistently able to manage her own lifestyle even without the children being in her home. … [I]t was always somebody else's fault. It didn't seem like she would take responsibility for losing her money or doing things like that. There was always an excuse.

Giles recalled one occasion when Mother stated she did not have 50 cents to buy a paper to look for housing. Giles "reminded her that she always managed to have money for cigarettes or to stop and buy a pop if she needed one." Giles tried to get Mother to attend, at no cost to Mother, a nutrition class which involved "budgeting skills, nutrition education, things like that…." Giles agreed to arrange for Mother's transportation to and from the class. Mother refused to take the class because it was not court ordered and was not part of the permanency plan. Based on the events which took place while Giles was working with Mother, Giles expressed her concern over Mother's ability to maintain stable housing and a stable income in order to take care of her children.

Barbara Prewitt ("Prewitt"), a case manager with DCS, also testified at trial. One of Prewitt's duties is to work with parents and children with the goal of reunification. In June of 2002, Prewitt was assigned the cases involving Mother's two oldest children, and Prewitt received the case involving the third child one month later. Prewitt discussed her most recent contact with Mother. During this conversation, Mother informed Prewitt that she was pregnant again and that a friend and the friend's two children were staying with Mother. Mother told Prewitt that she and the father of her fourth child recently had been in an altercation where they hit each other. Mother also told Prewitt she had sold hydrocodone pills to a neighbor for five dollars a piece.

Prewitt stated that Mother has difficulty dealing with all three children at once. According to Prewitt, Mother is not self-supporting and is given money from boyfriends for food and to pay the rent. Prewitt testified that she is aware of nine different places where Mother has lived since January of 2003, and Mother is consistently late with rent and utility payments. Prewitt acknowledged that Mother had completed many of the requirements of the permanency plans, but nevertheless, "a lot has not changed." Mother did pass one drug test, but told Prewitt on another occasion that she could not pass a drug test because a boyfriend had given her a hydrocodone pill. Even though Mother has lived in her apartment for six months, Prewitt testified that overall, Mother has not exhibited stability in housing or money matters, impulse control, or anger management. Prewitt also noted that Mother owes the Hamblen County courts approximately $2,000 for "having to be moved out of homes when she didn't pay the rent, for petitions, order of protection, court cost[s], and for the traffic tickets and just various things…." Prewitt stated that all three of Mother's

oldest children are in the same foster home and their foster care placement will remain the same if Mother's parental rights are terminated. Prewitt described the children as doing "very well" with their foster parents.

The Juvenile Court issued thorough and considered findings of fact after the trial. The Juvenile Court discussed in detail the pleadings in this case as well as the trial testimony which, for purposes of brevity, we will not restate. The only other testimony needing mention is that of Alice Garland, M.S. ("Garland"), who has been a psychological examiner for seventeen years. The Juvenile Court summarized Garland's testimony as follows:

> Alice Gardner … stated that mother's IQ is in the borderline range, her judgment is very poor, she uses denial and rationalization, has a borderline personality disorder, is struggling to keep herself together and would need intensive and ongoing case management intervention until her children were raised.

After reviewing the facts and the requirements of the permanency plans, the Juvenile Court concluded that the conditions leading to the removal of the three children at issue in this case still persisted and that Mother had failed to substantially comply with the terms of the permanency plans. According to the Juvenile Court:

> The conditions which existed at the placement of the three children into state custody still exist: mother has a temper, mother is impulsive, mother continues to become pregnant, mother was homeless for eight months during 2003, mother has not continued in her aftercare for her substance abuse and most telling, mother only attended six counseling sessions during 2003. Psychological examiner Alice Garland testified that mother would need extensive and intensive case management during the children's minority if mother had control of the children. Mother cannot even take care of herself when she has no children in her care.…

> When this matter was tried, the latest permanency plan was the one of April 3, 2003. Mother has substantially failed to comply with the following: continue to participate in aftercare at New Hope, do not use alcohol or drugs, obtain safe, adequate housing within thirty days, pay bills in full when due, continue counseling at CHS, and maintain stability in housing, money matters, decision making, impulse control and anger management.…

> Mother chose to not attend aftercare even after the birth [of her fourth child]. Her excuse for not attending previously was that her pregnancy with [the fourth child] was a difficult one. … She was

consistent during 2002, yet she became intoxicated during July 2002, went to her boyfriend's home, and committed an act of violence. [The third child] was then removed. She became intoxicated again in July, 2003 while pregnant with [the fourth child]. She took hydrocodone that was not prescribed for her during 2003 … and sold hydrocodone to a neighbor.

Mother's counseling was sporadic during 2003 – she attended only six sessions. Mother has an uncontrollable temper as evidenced by her assault conviction in 2002 and her admission of an altercation in 2003 with her step-mother. … She has been homeless for most of 2003 because she has not managed her finances.… She refused to go to a nutritional seminar that was offered free and with free transportation.… Mother does not even comprehend, she says, why her children are not in her care. She testified, "I think I did a dang good job for me being a single mother."

After making these factual findings, the Juvenile Court concluded that DCS had proven by clear and convincing evidence that Mother's parental rights should be terminated for her failure to substantially comply with the terms of her permanency plan and because the conditions which led to the removal of the children continued to persist. The Juvenile Court also concluded that there was clear and convincing evidence that termination of Mother's parental rights was in the best interest of the children.

Mother appeals claiming there was no clear and convincing evidence to support terminating her parental rights on either of the two grounds relied upon by the Juvenile Court. Mother also claims there was no clear and convincing evidence to support a finding that termination of her parental rights was in the best interest of the children.

## Discussion

The factual findings of the Juvenile Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). In *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 Tenn. App. LEXIS 317 (Tenn. Ct. App. May 12, 2004), *no appl perm appeal filed*, this Court observed that:

Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c), we must adapt Tenn. R. App. P. 13(d)'s

customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for terminating the biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 546; *Ray v. Ray*, 83 S.W.3d at 733; *In re L.S.W.*, 2001 Tenn. App. LEXIS 659, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *5 (Tenn. Ct. App. Sept. 6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).

*In re Adoption of T.A.M.,* 2004 Tenn. App. LEXIS 317, at ** 8-9 (footnote omitted).

In *Dep't of Children's Servs. v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights. Specifically, we observed:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).…

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed.*

Termination of parental rights may be based upon a number of statutory grounds. The statutory provisions relied upon by the Juvenile Court in the present case provide that parental rights can be terminated for the following reasons:

> (2)   There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

> (3)(A)  The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> > (i)   The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

> > (ii)   There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

> > (iii)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. §§ 36-1-113(g)(2) and (g)(3) (Supp. 2004).  The Juvenile Court found there was clear and convincing evidence that the statutory grounds for termination in Tenn. Code Ann. §§ 36-1-113(g)(2) and (g)(3) had been met.  Clear and convincing evidence supporting any single ground will support a termination order.  *See In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first will discuss whether the Juvenile Court erred when it concluded there was clear and convincing evidence that Mother had not substantially complied with the terms of the most recent permanency plans.  The testimony at trial by Mother and DCS representatives was to the effect that Mother had completed classes and evaluations that were required of her.  For example, Mother completed the alcohol and drug assessment and a treatment program.  However, the plan also required Mother to participate in an aftercare program, which she did not do.  The plan clearly required Mother to stay alcohol and drug free, which she also did not do.  With regard to Mother's housing situation, Mother was required by the plan to obtain adequate housing within thirty days and to pay her rent on time.  This she did not do as evidenced by the fact that she was living in homeless

-11-

shelters after the thirty days had passed. To her credit, by the time of trial Mother had an apartment where she had lived for six months, but based on Mother's substantial housing problems in the past, a factual issue was presented as to whether Mother has demonstrated an actual ability to provide proper housing for the children. The plan also required Mother to continue counseling, but she only attended six sessions in 2003.

Mother's permanency plans did require that she attend parenting classes, treatment programs and the like. All of these requirements were in place to achieve one ultimate goal: for Mother to provide a safe and stable environment to properly raise her children. In fact, the permanency plan listed as an expected goal that Mother "will have a suitable home life for her children. [Mother] will demonstrate that she can provide a stable home life for her children by maintaining stability in her own life and complying with this plan of care until permanency is achieved." It makes no difference how many parenting classes are completed if the parent is incapable or unwilling to learn anything from the classes and adjust his or her behavior accordingly. While we believe Mother did complete many of the physical requirements of the plan by attending parenting classes and the like, she did not accomplish any of the goals of the plan. In addition, as noted above there were several important specific requirements of the plan that Mother did not comply with, such as staying drug and alcohol free. The evidence does not preponderate against the factual findings of the Juvenile Court. We further conclude that the facts as found by the Juvenile Court are such that we cannot conclude the Juvenile Court erred when it held there was clear and convincing evidence that Mother had failed to substantially comply with the terms of the permanency plan.

The next issue is whether there was clear and convincing evidence to terminate Mother's parental rights in accordance with Tenn. Code Ann. § 36-1-113(g)(3), *supra*. The Juvenile Court found that the children had been removed from the home for more than six months, which they clearly had, and (1) that the conditions which led to their removal or other conditions which in all probability would cause the children to be subjected to further neglect still existed; (2) there was little likelihood that these conditions would be remedied at an early date so that the children could be safely returned to Mother; and (3) continuation of the parent and child relationship greatly diminished the children's chances of early integration into a safe, stable, and permanent home. When considering the record as a whole, we cannot say that the Juvenile Court erred when it concluded there was clear and convincing evidence to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3). The Juvenile Court's judgment on this issue is, therefore, affirmed.

Having affirmed the Juvenile Court's conclusion that grounds existed pursuant to §§ 36-1-113(g)(2) and (g)(3), we now turn to whether termination of Mother's parental rights was in the best interest of the children. Tenn. Code Ann. § 36-1-113(i) describes the standard for determining whether termination is in the best interests of the child in such cases:

-12-

(i)  In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1)  Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)  Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)  Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)  Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)  The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)  Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)  Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)  Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)  Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2004).

Since the best interest determination requires a separate analysis, the existence of grounds to terminate parental rights does not automatically mean that termination of parental rights is in the best interest of the child. *See, e.g.*, *In re D.I.S.*, No. W2000-00061-COA-R3-CV, 2001 Tenn. App. LEXIS 358 (Tenn. Ct. App. May 17, 2001), *no appl. perm. appeal filed*. We do not believe Mother has made an adjustment of circumstances or conditions such that it would be safe for the children to be returned to her. DCS clearly has made a reasonable effort to assist Mother, but Mother has failed to make a lasting adjustment. After considering all relevant statutory factors in light of the evidence presented at trial, we do not believe the Juvenile Court committed reversible error when it concluded that clear and convincing evidence established it was in the best interest of the children to terminate Mother's parental rights.

### Conclusion

The judgment of the Juvenile Court is affirmed and this cause is remanded to the Juvenile Court for collection of the costs below. Costs on appeal are assessed against the Appellant C.D.W. and her surety, if any.

_____
D. MICHAEL SWINEY, JUDGE

-14-